UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALLISON SOVA, | : | CASE NO. |
|     Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| CARESTREAM HEALTH INC. f/k/a | : | |
| KODAK MOLECULAR IMAGING | : | |
|     Defendants | : | August 3, 2009 |

**COMPLAINT**

**I.     INTRODUCTION**

1. This is an action for money damages and other relief for violation of Title VII U.S.C. 2000 *et seq.* ("Title VII"), for retaliation in violation of Title VII and The Connecticut Fair Employment Practices Act, Connecticut General Statutes Sections 46a-58 and 46a-60 *et seq.* ("CFEPA"), and intentional and negligent infliction of emotion distress, arising out of Plaintiff's former employment with Defendants.

**II.    THE PARTIES**

2. Plaintiff, Allison Sova, is a female citizen of the State of Connecticut, residing in Southington, Connecticut.

3. Defendant, Carestream Health Inc., formerly known as Kodak Molecular Imaging ("Carestream") is a New York corporation which, at all times relevant to this matter, operated in Connecticut at an office located at 4 Science Park, New Haven, Connecticut.  At all times relevant to this matter, Defendant employed more than fifteen people.

**III. JURISDICTION**

4. The United States District Court for the District of Connecticut has subject matter jurisdiction over this case under the provisions of 28 U.S.C. Sections 1331 and 1343(4) because it asserts claims under an Act of Congress providing for the protection of civil rights.

5. This Court has jurisdiction over Ms. Sova's state law claims pursuant to 28 U.S.C. Section 1332, in that the matter in controversy exceeds the sum or value of $75,000 and is between a citizen of Connecticut and a citizen or subject of a foreign state.

6. In the alternative, this Court has jurisdiction over Ms. Sova's state law claims pursuant to 28 U.S.C. Section 1367(a) under the doctrine of supplemental jurisdiction.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)©, because Defendants may be found in this district and the challenged conduct occurred in this state.

**IV. PROCEDURAL REQUIREMENTS**

8. Ms. Sova has exhausted all applicable administrative remedies precedent to bringing her claims under Title VII and CFEPA and has obtained Releases of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities and the United States Equal Employment Opportunity Commission authorizing her to bring these claims.

**V. FACTUAL ALLEGATIONS**

9. Ms. Sova was employed by Defendant as a Senior Marketing and Communications Specialist in Defendant's New Haven, Connecticut office between April, 2000 and August 31, 2007.

10. Prior to May, 2006, Ms. Sova's performance reviews reflected that her performance was good and that she consistently met or exceeded all objectives. For example,

Ms. Sova's performance review for the year 2000 shows that she "Met all objectives, some results exceeded objectives." Ms. Sova's peers found her performance outstanding and her experience and organization saved the company money and her energy and attention to detail "quickly demonstrated her . . . value to the team." Likewise, Ms. Sova's performance reviews from the years 2001-2005 evidence that she "Consistently Demonstrates Values," and her review for the year 2005 specifically noted her "outstanding" job performance.

11. Prior to May 8, 2006, there were no complaints regarding Ms. Sova's behavior towards co-workers.

12. On the evening of May 8, 2006, John Attwood ("Atwood") one of Ms. Sova's supervisors and a Senior Manager of Defendant, yelled at, cursed at and physically threatened Ms. Sova.

13. Attwood's physically intimidating and threatening conduct was directed at Ms. Sova because of her gender, and she had a good faith basis for believing that his conduct constituted sexual harassment.

14. Sherman Hejazi ("Hejazi"), one of Ms. Sova's supervisors, overheard Attwood yelling at Ms. Sova and witnessed Ms. Sova's emotional turmoil as a result of Attwood's conduct when Hejazi came to Ms. Sova's office to find her crying and extremely upset following the incident with Attwood.

15. Hejazi did not comment on Ms. Sova's questions as to how he could allow Attwood to treat Ms. Sova that way and how he could expect Ms. Sova to feel safe at work.

16. Ms. Sova was so distraught over Attwood's threatening conduct that she was escorted outside to her car by co-worker Elizabeth White.

17. After repeated attempts to discuss the incident with both Chiang and Hejazi with no response, the following morning, Ms. Sova filed a Human Resources complaint with Defendant for sexual harassment, physical threatening and intimidation against Attwood.

18. Ms. Sova had no resources to work from home and as a result of the incident with Attwood, she was afraid to be at work and felt vulnerable.

19. As a result of Ms. Sova's complaint, an investigation took place, and as a result Attwood was disciplined, albeit minimally.

20. Following the investigation and discipline, however, Attwood continued to harass and threaten Ms. Sova.

21. Although no one was supposed to discuss the investigation, Hejazi and his secretary, Pat Sullivan did in fact discuss the investigation and employees were allowed to contact Ms. Sova while the investigation was in process; this discussion and contact was in violation of Carestream's own policies and regulations.

22. After Ms. Sova's May 8, 2006, complaint she became a target of retaliation and hostility by, *inter alia*, Attwood, Hejazi, Stephanie Chiang ("Chiang"), Kathleen Ehrhardt ("Ehrhardt"), Alice Huang ("Huang") and Terry Loukides ("Loukides").

23. After the May 8, 2006 complaint, Attwood would walk directly toward Ms. Sova in the hallways in a threatening manner and would glare at Ms. Sova. This conduct occurred at times daily and continued for months.

24. Ms. Sova repeatedly brought Attwood's threatening conduct to the attention of Ehrhardt in Defendant's Human Resources department. For example, in an email to Ehrhardt,

dated May 10, 2006, Ms. Sova informed Ehrhardt that she "was afraid to approach John [Attwood] again to find out the process to get the instruments for the photo shoot."

25. Despite Ms. Sova's numerous complaints, neither Ehrhardt nor anyone else took any actions concerning Attwood.

26. In an email to Ehrhardt on October 13, 2006, Ms. Sova again expressed her concerns about Attwood's conduct, stating that "you are not here nor is anyone else to see John [Attwood] walking back and forth sometimes quickly, sometimes slowly. . . . This was all through the day yesterday and today, looking in my office. I think anyone would feel the same way especially after seeing him in action in May."

27. Ehrhardt's response was for Ms. Sova "not to be anxious about something that has not happened."

28. The aggressive and harassing conduct of Attwood was continuous and was handled neither promptly nor effectively by Carestream.

29. After the May 8, 2006 complaint, Hejazi began to avoid Ms. Sova and no longer came into her office to talk with her. Hejazi also urgently pressured Ms. Sova to give up her office and to relocate to Attwood's former office, knowing how uncomfortable that arrangement made Ms. Sova feel because of Attwood's conduct toward Ms. Sova on May 8, 2006.

30. After the May 8, 2006 complaint, Chiang did not respond to Ms. Sova's repeated questions about receiving compensation for having undertaken a large amount of responsibilities, that normally would have been handled by a marketing manager. Ms. Sova never was compensated for this work.

31. After Ms. Sova's complaint, Loukides began to act very aggressively towards Ms. Sova.

32. On or about August 23, 2006, an altercation ensued between Loukides and Ms. Sova as a result of Loukides' aggressive behavior.

33. The aggressive behavior by Loukides included slamming his hand on Ms. Sova's desk and yelling at her regarding the shipping of instruments to their facility.

34. Although Ms. Sova made repeated complaints regarding Loukides' behavior to Chiang (her immediate supervisor), Ehrhardt and Hejazi, her complaints were ignored.

35. As a result of the August 23, 2006 altercation, Ms. Sova falsely was accused of "inappropriate conduct by yelling at a co-worker" and was placed on a performance plan.

36. Loukides was not disciplined for this incident, even though he was the aggressor.

37. This retaliatory plan included the false statement that Ms. Sova previously had displayed similar behavior on May 8, 2006, when, in fact, the May 8, 2006 incident was the harassing and aggressive behavior of Attwood, for which he was disciplined.

38. As a condition of the performance plan Ms. Sova was forced to undergo six months of humiliating and demeaning monthly counseling with Chiang and Huang.

39. While Ms. Sova was forced to undergo six months of counseling, according to a summary of the altercation written by Vincent Mohr, Loukides only was asked to follow up with Carestream "if appropriate." This is despite the finding that Loukides was "combative, loud, aggressive and confrontational."

40. Ms. Sova continued to experience retaliatory actions by Chiang and Huang throughout the time period of these required counseling sessions.

41.     Ms. Sova attempted to contact Ehrhardt and Human Resources for several days in September, 2006 in an attempt to discuss the allegation that she had yelled at a co-worker. Ehrhardt, however, was too busy to discuss the matter with Ms. Sova and replied, in an email dated September 25, 2006, "I am sorry but I am in meetings for 4 straight days - back to back.  I am aware of the situation and ask that you just be patient while it is being reviewed."

42.     On or about October 13, 2006, Ms. Sova again expressed her concerns about Attwood's and Loukides' aggressive behavior in a letter to Chiang.  Ms. Sova expressed her concerns over her safety and again sought to clarify that she did not yell at Loukides on August 23, 2006.

43.     In this letter to Chiang, Ms. Sova also reiterated her feelings that "this is a witch hunt, and I am vulnerable to allegations and aggressive behavior by others."

44.     Ms. Sova also reiterated previous statements to Chiang that she needed some reassurances that she would be safe at work.  Chiang's response was that Ms. Sova could work from home the following week, however, Ms. Sova did not possess a laptop adequate to complete the work which needed to be done.  As such, Chiang did not present Ms. Sova with any sufficient work alternatives or adequate reassurances that she would be safe at work.

45.     Despite Defendant's stated "zero-tolerance policy for harassment or intimidation, including harassment or intimidation because of . . . sex . . . or other legally protected characteristic," Defendant did not adequately or promptly respond to Ms. Sova's complaints or concerns about her safety and her treatment by her supervisors and other employees.

46. By failing to take any steps to not remedy the harassment and intimidation continuously suffered by Ms. Sova, Defendant violated its own supposed "zero tolerance" policy.

47. On or about January 4, 2007, Huang falsely accused Ms. Sova of accepting gifts from vendors, an accusation which, if true, could lead to criminal prosecution.

48. Despite the falsity and the seriousness of this accusation, Huang refused to inform Ms. Sova who had made this accusation and also refused to put the accusation in writing.

49. Ms. Sova was forced by Huang to contact vendors who had sent token holiday gifts to her Department in a humiliating and degrading effort to clarify and document the dollar value of each gift made, and to clear her name of any wrongdoing.

50. On or about January 5, 2007, Ms. Sova contacted Huang via email to express that she was very upset over this allegation and to express her concern over Huang's treatment of her. Ms. Sova told Huang that she was constantly feeling harassed and intimidated. Ms. Sova further expressed her concerns over an earlier incident in which Huang erroneously accused Ms. Sova of wasting company money by printing emails on a color printer.

51. In January 2007, following this false accusation, Huang gave Ms. Sova a poor performance review.

52. Ms. Sova experienced harassment and retaliation up through her termination on August 31, 2007.

53. On August 27, 2007, Ms. Sova was called into Hejazi's office and was told that she was again being investigated for allegedly yelling at another employee.

54. While Ms. Sova suggested that Hejazi speak with two witnesses to the alleged incident, Elizabeth White and Pat Sullivan, to corroborate that Ms. Sova's conduct was proper, Hejazi refused to do so.

55. Ms. Sova also informed Hejazi that he should investigate "upper-tier management" in regards to the issue of yelling at co-workers.

56. Hejazi informed Ms. Sova that she was suspended pending investigation and Ms. Sova was escorted out of the building.

57. Over the next several days, Ms. Sova's repeatedly attempted to contact Defendant to discuss the status of the investigation and to learn if Ms. White and Ms. Sullivan had been interviewed. Despite these attempts, no one would speak with Ms. Sova about the investigation or give her any information regarding her status..

58. Ms. Sova was never contacted regarding the investigation and was never given the opportunity to respond to the allegations made against her

59. On or about August 31, 2007, Ms. Sova was called into a meeting with Hejazi and Ehrhardt and was told "we have decided not to continue your employment."

60. Hejazi refused to explain why Ms. Sova was being terminated.

61. Ms. Sova was then informed by Ehrhardt that because she was being terminated on the last day of the month, Ms. Sova's health insurance would be cancelled at midnight the same day.

## VI. COUNT ONE: GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

62. Defendant's conduct, as described above, constitutes discrimination based upon gender in violation of Title VII, 42 U.S.C. § 2000 *et seq.*

63. As a result of Defendant's discrimination, as described above, Ms. Sova has suffered both economic and non-economic damages, including but not limited to lost wages and benefits, loss of job opportunities, damage to her professional reputation, mental and emotional distress and insult to her dignity as a human being.

## VII. COUNT TWO: GENDER DISCRIMINATION IN VIOLATION OF CFEPA

64. Defendant's conduct, as described above, constitutes discrimination based upon gender in violation of CFEPA.

65. As a result of Defendant's discrimination, as described above, Ms. Sova has suffered both economic and non-economic damages, including but not limited to lost wages and benefits, loss of job opportunities, damage to her professional reputation, mental and emotional distress and insult to her dignity as a human being.

## VIII. COUNT THREE: RETALIATION IN VIOLATION OF TITLE VII

66. Defendant's conduct, as described above, constitutes retaliation under Title VII as such conduct was likely to dissuade a reasonable worker from making or supporting a charge for discrimination.

67. As a result of Defendant's retaliation, as described above, Ms. Sova has suffered both economic and non-economic damages, including but not limited to, lost wages and benefits, loss of job opportunities, damage to her professional reputation, mental and emotional distress and insult to her dignity as a human being.

**IX.     COUNT FOUR:      RETALIATION IN VIOLATION OF CFEPA**

68. Defendant's' conduct, as described above, constitutes retaliation for having opposed discriminatory practices, in violation of Connecticut General Statutes Sections 46a-58 and 46a-60.

69. As a result of Defendant's retaliation, as described above, Ms. Sova has suffered both economic and non-economic damages, including but not limited to, lost wages and benefits, loss of job opportunities, damage to her professional reputation, mental and emotional distress and insult to her dignity as a human being.

**X.      COUNT FIVE:      WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

70. Defendant's conduct in terminating Plaintiff as described above is a violation of the public policy of the state of Connecticut, as expressed in Sections 31-49 and 31-370 of the Connecticut General Statutes, which require employers to provide their employees with a reasonably safe place to work that is free from recognized hazards that are likely to cause serious physical harm, and to ensure that an employee's coworkers are fit and competent persons.

71. As a direct and proximate result of Defendant's illegal termination of Plaintiff, Plaintiff has suffered damages including lost wages and benefits, damage to her personal and professional reputation, emotional distress and attorneys' fees.

**XI.     COUNT SIX:            INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

72.     Defendant knew or recklessly disregarded that the extreme and outrageous conduct of its employees, as set forth above, was likely to cause Ms. Sova emotional distress.

73.     Ms. Sova in fact suffered severe emotional distress as a direct result of Defendant's conduct, for which she sought medical treatment.

74.     Defendant's conduct was the direct cause of Ms. Sova's emotional distress.

75.     As a result of Defendants' intentional infliction of emotional distress, Ms. Sova suffered various damages including lost wages, humiliation, embarrassment, mental anguish and emotional distress.

**XII.    COUNT SEVEN:    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

76.     Defendant's conduct, as set forth above, was unreasonable regarding the termination of Ms. Sova's employment, as she was forced to wait at least four days without being contacted about the investigation, she received no response to her inquiries regarding the investigation or her status, and Defendant refused to provide Ms. Sova with any information regarding the pending investigation, thus leaving her "in limbo," not knowing whether or not she would be terminated.

77.     Defendant's unreasonable conduct in the delay of Ms. Sova's termination is amplified by the fact that Defendants knew Ms. Sova was a single mother.

78.     Defendant's conduct, as set forth above, was unreasonable and created a foreseeable risk of emotional harm.

79.     Ms. Sova in fact suffered severe emotional distress as a direct result of Defendant's conduct, for which she sought medical treatment.

80. Defendant's conduct was the direct cause of Ms. Sova's emotional distress.

81. As a result of Defendants' intentional infliction of emotional distress, Ms. Sova suffered various damages including lost wages, humiliation, embarrassment, mental anguish and emotional distress.

## XII. DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiff claims:

1. Compensatory damages, including but not limited to back-pay, front-pay, lost benefits, lost pension benefits, damages for emotional distress and for injury to personal and professional reputation;

2. Common law punitive damages;

3. Interest and costs;

4. Common law and/or statutory attorneys' fees, as permitted under Connecticut General Statutes Section 46a-104; and

5. Such other relief as in law or equity may pertain.

## JURY DEMAND

Plaintiff, Allison Sova, demands a jury trial.

Plaintiff, Allison Sova

By: _____
    Anthony J. Pantuso, III, Esq.
    The Pantuso Law Firm, LLC
    Federal Bar No. Ct11638
    204 Broad Street, Second Floor
    Milford, CT 06460
    (203) 876-0000
    (203) 877-1839 (facsimile)
    apantuso@pantusolaw.com
    Attorney for the Plaintiff